IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BOBBY L. T.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 3:19-cv-00380-DGW[2] |
| | ) |
| COMMISSIONER of SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM and ORDER**

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Income Security (SSI) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for both DIB and SSI in November 2015, alleging disability as of December 1, 2011. After holding an evidentiary hearing, an ALJ denied the application on February 14, 2018. (Tr. 59). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1).

---

[1] In keeping with the court's practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 12.

Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.     The ALJ erred in assessing the reliability of plaintiff's allegations.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3]  Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his former occupation? and (5) Is the plaintiff unable to perform any other work?  20 C.F.R. § 404.1520.

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which plaintiff can perform. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921

(7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date, December 1, 2011. He was insured for DIB through March 31, 2016.

The ALJ found that plaintiff had severe impairments of Arnold Chiari Malformation[4] status post-surgery 2005, abdominal hernia status post repair, degenerative disc disease, sleep apnea, and depression and anxiety.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform light work limited to occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolding; occasionally balancing, stooping, kneeling, crouching, and crawling; and avoiding concentrated exposure to loud noise. The ALJ also found plaintiff able to understand, remember and carry out instructions for simple tasks on a sustained basis.

Based on the testimony of a vocational expert (VE), the ALJ concluded plaintiff was unable to perform any past relevant work, yet concluded there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

---

[4] Arnold Chiari Malformation refers to "a condition in which brain tissue extends into your spinal canal." https://www.mayoclinic.org/diseases-conditions/chiari-malformation/symptoms-causes/syc-20354010, visited on December 18, 2019.

## **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to plaintiff's arguments.

**1.    Agency Forms**

Plaintiff was born in 1976 and was 41 years old on the date of the ALJ's decision. His current alleged date of onset is December 1, 2011. (Tr. 252). Plaintiff said he stopped working on December 1, 2011 because of his condition. He worked different jobs from 2002 to 2011, including pest control, construction, and sales. (Tr. 256-257).

In a Function Report submitted in November 2015, plaintiff said he could not work because of severe headaches, loss of concentration, memory issues, confusion, and problems sleeping, among other things. On a typical day, he took a shower, cleaned the house, took medicine, fed his animals, prepared and ate meals from the microwave because he often forgot food on the stove, watched television, and slept. He took care of his children on Wednesday and every other weekend with the help of his thirteen-year-old daughter. He would often not eat but then think he did. He did household chores if his headache was not too bad, liked to go to church and play the guitar, and went outside daily. His conditions reportedly affected his lifting, bending, standing, walking, sitting, kneeling, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, and

following instructions.  (Tr. 274-279).

**2.     Evidentiary Hearing**

An attorney represented plaintiff at the evidentiary hearing in September 2017.  (Tr. 69).

Plaintiff said he has a bad headache once every other week but usually has a constant headache.  He said he has blurry vision which causes his headaches to get more intense.  He said the headaches had been going on since both his accident in 2004 and the Arnold Chiari Malformation surgery, and they worsened since.  He described his memory as "pretty good for a little while," but cannot remember what happened a day or two later.  His memory has been that way since the Chiari malformation surgery.  (Tr. 79-80).  He is sleepy and in pain most days.  (Tr. 83-84).

The VE testified that a person with plaintiff's RFC could perform light, unskilled jobs, which include Laundry Worker, Assembler, or Mail Room Clerk.  If plaintiff were to miss work on average of three days per month on an unscheduled, ongoing basis, he would not be able to do any work.  The VE acknowledged that an individual who is off-task at least 15% of the day or more would be unable to sustain employment.  (Tr. 88-89).

**3.     Relevant Medical Records**

In April 2014, a chiropractor saw plaintiff for headaches, memory issues, and diarrhea.  (Tr. 418).

In July 2014, Clinton Mohr, an internist, saw plaintiff for headaches. In the review of systems, Dr. Mohr noted "memory lapses or changes." An MRI of the brain showed essentially negative results. (Tr. 540, 663). Dr. Mohr saw plaintiff once in August 2014 for a follow up on his headaches. Plaintiff said Diamox was helpful, but he developed side effects of diarrhea, incontinence, and a rash on his chest. Dr. Mohr discontinued Diamox and started Plaintiff on Flexeril at night and Tramadol during the day. Plaintiff saw Dr. Mohr again in March 2015 when he again complained of worsening headaches that kept him up at night. (Tr. 655, 660-661).

In May 2015, Cathy Bless, a physician assistant, referred plaintiff to Cape Neurology Specialists with the diagnosis of a memory problem. (Tr. 757). In September 2015, plaintiff saw Dr. Mohr with a chief complaint of memory impairment with which he had episodes of rage and no recollection of such. (Tr. 648). An MRI of the brain showed unchanged conditions. (Tr. 524-525).

In November 2015, Plaintiff saw Esteban Golombievski, a neurologist, for a consultation to address memory and headache issues. Dr. Golombievski took note of plaintiff's car accident in 2004 and its reported effects, including daily headaches with five severe episodes a month and additional memory issues. Dr. Golombievski noted plaintiff had an inappropriate mood and affect, and was in pain but had a normal attention span and concentration. Dr. Golombievski's assessment included chronic daily headache. He discontinued Tramadol and started plaintiff on Topamax. (Tr. 375, 378).

Plaintiff saw Gabe Martin, a physician assistant, in December 2015 complaining of worsening mood and anxiety that interfered with sleep, household activities and work, while suggesting a context of family problems, relationship stress, and tobacco use. PA Martin noted a severe head injury and concussion while plaintiff served in the military, intact memory, and an anxious, sad, and tearful mood and affect. (Tr. 400-401).

In January 2016, plaintiff saw Adrian Feinerman, an internist, for a Consultative Exam Report. Plaintiff complained of a deteriorated memory and ten years of continuous headaches. (Tr. 388). Dr. Feinerman noted plaintiff's memory and concentration were normal. (Tr. 394).

Plaintiff saw Dr. Mohr in January 2016 reporting he lost his insurance and, therefore, had not returned to see the neurologist. Plaintiff said he did not start Topiramate (Topamax), continued to have frequent headaches, had mood swings and anxiety, and was going to try filing for disability. Dr. Mohr started plaintiff on Topiramate for headaches, as well as Ativan and Celexa for anxiety. (Tr. 647-648).

Plaintiff saw PA Martin in February and March 2016 for panic, anxiety, and major depressive disorders. Plaintiff stated the Ativan was unhelpful, and he reported worsening mood, increased anxiety, panic symptoms, family problems, legal problems, relationship stress, depression, and sleep disturbances. PA Martin noted plaintiff as guarded and sad with an impaired memory and tangential thought processes. (Tr. 406-407).

Plaintiff saw Dr. Golombievski in March 2016 complaining of headaches and

memory impairment with which he forgets appointments and things to do. Dr. Golombievski noted normal recent and remote memory, normal attention span and concentration, and inappropriate mood and affect. His assessment consisted of amnesia and chronic daily headache. (Tr. 676-678). Plaintiff then underwent an electroencephalogram[5] (EEG) administered by Bhargav Trivedi, a neurologist, in March 2016, and the results were normal. (Tr. 639).

Between April and May 2016, plaintiff saw PA Martin complaining of increased anxiety and panic symptoms that interfere with household activities, sleep, relationships, and work. He reported having family problems, legal problems, and relationship stress. PA Martin noted plaintiff was anxious, his memory was impaired, and his thought processes were tangential. PA Martin ordered plaintiff continue with Klonopin and Zoloft. He ordered a hold on plaintiff taking Zyprexa due to him having to care for his children at night and it making him fatigued. (Tr. 566-569).

Plaintiff saw Michael Luy, a physician, in June 2016 complaining of chronic headache and neck pain with numbness and tingling in the right side. (Tr. 641-642). Dr. Luy dismissed plaintiff for having a narcotic in his urine that he had not prescribed. (Tr. 774).

Plaintiff saw PA Martin in July 2016 stating he was doing a bit better, yet still

---

[5] Electroencephalogram refers to "a graphic record of the electrical activity of the brain as recorded by an electroencephalograph." https://medical-dictionary.thefreedictionary.com/electroencephalogram, visited on December 18, 2019.

experiencing family problems and anxiety. (Tr. 563). Plaintiff saw PA Bless that same month with complaints of headaches and depression. (Tr. 767). PA Bless ordered a pill box set up for plaintiff due to his memory problem and noted plaintiff would probably benefit from counseling, but he declined. (Tr. 777). Amanda Reynolds, an advanced practice nurse, saw plaintiff that same day and suggested a speech therapy referral due to plaintiff's memory impairment. (Tr. 772).

In August 2016, plaintiff saw PA Bless reporting depression. Medicaid denied two of his psychiatric medications, and he had issues getting his pill boxes because the woman who put them together was on vacation. (Tr. 759).

Plaintiff saw PA Martin in October 2016 and reported doing okay with the medications, yet still struggling with working memory, family issues, and anxiety. (Tr. 561). Plaintiff then saw PA Bless complaining of migraines, which caused him blurred vision, memory impairment, and sensitivity to light, and stated the pharmacy never filled his Topiramate. (Tr. 751). Plaintiff then saw Tiffany Ward, a neurologist, due to Arnold Chiari Malformation and spells, stating he has constant headaches, memory difficulties, and sudden confusion while driving and having conversations. The neurological exam was normal. (Tr. 672, 674).

Plaintiff underwent an EEG in November 2016 due to headache and amnesia, and the impression was normal. (Tr. 671). Plaintiff then saw PA Bless and said Meloxicam made him dizzy and confused. (Tr. 744). Plaintiff's neurological exam showed moderately impaired short-term memory. PA Bless had plaintiff stop Meloxicam and start Diclofenac. (Tr. 746).

Plaintiff saw PA Martin in December 2016 reporting he had not had his medications consistently, and he was still experiencing anxiety and difficulty with working memory. PA Martin noted plaintiff's memory was intact, yet he was sad, anxious, flat, and his thought processes were tangential. (Tr. 559-560).

Plaintiff saw Dr. Ward in January 2017 complaining of headaches with nausea, having more memory problems, and stating Topiramate was unhelpful. Dr. Ward stopped Topiramate, started plaintiff on Depakote, and ordered a brain MRI. (Tr. 668, 670). Plaintiff then saw PA Bless complaining of musculoskeletal pain, headache, and anxiety. Plaintiff said Dr. Ward gave him injections in the back of his head for the headaches which helped a lot. (Tr. 732).

Plaintiff saw PA Martin in February 2017 reporting worsening mood, increased anxiety and panic symptoms that all interfered with sleep, work, and relationships. He was not taking Zyprexa and stated he could not tolerate it as it made him feel more agitated. PA Martin noted impaired memory, insight, and judgment, stopped the use of Klonopin, and added Valium and Risperdal. (Tr. 556-558).

On February 14, 2017, plaintiff went to the emergency room due to headaches and chest pressure and underwent an MRI of his brain. (Tr. 620, 622). The MRI showed possible representation of chronic changes of migraine headaches, chronic sinusitis, and no acute intracranial abnormalities. (Tr. 623). Plaintiff was transferred back to the emergency room due to shaking while in the MRI, a bad headache, and feelings of a racing heart. (Tr. 598).

Plaintiff saw PA Martin on February 15, 2017, stating he had a lot of panic and thoughts of driving himself into a tree to end his life due to his home catching fire the night before. PA Martin noted plaintiff's memory impaired, insight impaired, his mood sad, his affect anxious and flat, and his thought process tangential. (Tr. 555). Later that afternoon, plaintiff presented at the emergency room for depression with suicidal thoughts of driving his truck into a tree and agreed on admission to the Mulberry Center for inpatient treatment. (Tr. 448, 502).

Clayton Ford, a family practice physician, evaluated plaintiff the next day on February 16, 2017. Dr. Ford could not say the Tramadol was a good choice for plaintiff's headaches but suggested plaintiff might be a good candidate for a Botox injection trial. (Tr. 503-504). Naeem Qureshi, a psychiatrist, stopped both Risperdal and Zyprexa in order to possibly start plaintiff on other medications. (Tr. 509).

Dr. Qureshi evaluated plaintiff daily from February 17, 2017 to February 19, 2017. He noted plaintiff's depressive symptoms, flat affect, additional suicidal ideations, anxiety, restlessness, and issues with attention and concentration, and his assessment included Major Depressive Disorder and Anxiety Disorder. On February 19, 2017, Dr. Qureshi noted a decision to avoid prescribing plaintiff controlled substances due to a suspicion of substance abuse. He also noted multiple medication changes during plaintiff's inpatient treatment and plaintiff's decision to leave inpatient treatment. Plaintiff was discharged that night. (Tr. 510-512, 514, 516).

On February 21, 2017, plaintiff saw PA Bless for a follow up appointment post-house fire and reported having anxiety, headaches, and shortness of breath. (Tr. 722).

Plaintiff returned to the emergency department on February 26, 2017. Michael Blain, an emergency department physician, saw and admitted plaintiff. Plaintiff reported headaches, having thoughts for two weeks of committing suicide by way of pills, crying episodes, and feelings of anxiety, depression, hopelessness, sadness, frustration, and stress. Dr. Blain noted plaintiff's memory as intact. (Tr. 422, 425).

Austin Stallings, a physician assistant, saw plaintiff the following day. During evaluation, plaintiff denied headache or memory loss, and PA Stallings found plaintiff's recent and remote memory intact. (Tr. 464-465). PA Stallings noted tremors in the right hand and arm that could possibly be due to anxiety or other neurologic disorders. (Tr. 467). That same day, Dr. Qureshi saw plaintiff and noted plaintiff's anxiety symptoms worsened after he visited where his house burned down, which made him feel more depressed, hopeless, helpless, worthless, irritable, and agitated. Plaintiff reported troubles with sleeping, dreaming of killing himself, and memory problems due to an accident when he developed Arnold Chiari Malformation. (Tr. 480). Dr. Qureshi recommended inpatient psychiatric treatment at the Mulberry Center. (Tr. 484).

Dr. Qureshi evaluated plaintiff on February 28, 2017, noted plaintiff's depressed mood and resulting troubles with attention and concentration, noted the

effect Ambien had on plaintiff's vivid dreaming, and recommended plaintiff receive five to seven days of inpatient hospitalization for psychiatric treatment. (Tr. 496-498). During this stay, plaintiff started back on his medications, reported feeling better, and requested discharge on March 1, 2017. (Tr. 494-495).

Plaintiff immediately returned to see PA Martin for a follow up and complained of difficulty with working memory, as well as continued issues with anxiety and depression that interfere with household activities and sleep. PA Martin noted plaintiff's memory, insight, and judgment as impaired. (Tr. 552-553). Plaintiff saw PA Martin again in March 2017. He said his anxiety and depression symptoms continued to interfere with household activities and sleep, he continued having difficulty with working memory, and his partner helped with his medications. PA Martin again noted plaintiff's memory impaired. (Tr. 549-550).

Plaintiff saw PA Bless in May 2017 for a checkup and medication refills, and he complained once again of depression. (Tr. 716).

Plaintiff saw PA Martin in May and August of 2017 complaining of unhelpful sleep medications, thoughts of driving himself into a tree, anxiety, depression and panic symptoms that interfered with household activities and sleep, and difficulties with working memory, relationship stressors, and headaches. PA Martin noted plaintiff's memory was impaired, his speech was slow, and his behavior was guarded. PA Martin stopped Ambien and started plaintiff on Restoril. (Tr. 544-546, 548).

On August 16, 2017, PA Martin filled out a Medical Source Statement in

which he listed plaintiff's mental diagnoses of Manic Depressive Disorder, Anxiety Disorder, and Panic Disorder. He noted plaintiff experiences medication side effects such as drowsiness, dizziness, and lack of focus. PA Martin estimated plaintiff would miss approximately four days of work a month and would be off task about 25% or more due to his symptoms. PA Martin noted plaintiff's memory impairment as "Extremely Limited" and his sustained concentration and persistence anywhere from "Moderately Limited" to "Extremely Limited." (Tr. 574-575).

Plaintiff started speech therapy on August 28, 2017. A speech and language pathologist, Mike Murphy, reported plaintiff's speech as, "Unremarkable without signs or motor speech disorder" and his language as, "Unremarkable without signs of expressive or receptive aphasia[6]." Based off the Ross Information Processing Assessment, SLP Murphy classified plaintiff's immediate memory in Percentile 84 and his recent memory in Percentile 50. SLP Murphy identified plaintiff's attention as having moderate to severe impairment and his memory as having moderate impairment. In his assessment, SLP Murphy stated, "The patient exhibits marked cognitive deficits characterized by marked memory deficits and slow processing, which are significantly and negatively impacting his activities of daily living, such as the ability to hold meaningful employment." SLP Murphy recommended plaintiff

---

[6] Aphasia refers to a "condition characterized by either partial or total loss of the ability to communicate verbally or using written words." https://medical-dictionary.thefreedictionary.com/aphasia, visited on December 18, 2019.

receive speech therapy three days per week for forty-five to sixty minutes each session for the following eight weeks. (Tr. 825-826).

Plaintiff continued speech therapy by attending six more sessions between August 30, 2017 and September 11, 2017, and saw Briana Jones, a speech and language pathologist, for each appointment. (Tr. 784, 790, 796, 802, 808, 814). In SLP Jones' assessment notes after each appointment, she stated, "The patient exhibits marked cognitive deficits characterized by marked memory deficits and slow processing, which are significantly and negatively impacting his activities of daily living." (Tr. 785, 791, 797, 803, 809, 815). Plaintiff learned to use a memory notebook as a memory log and planner, which proved to be beneficial for him. (Tr. 785). He recorded the date, when he took his medications, his plans for the day, and used it in the evening to log what he did that day. (Tr. 785). He used a printed schedule to keep track of his appointments, forgot to bring his notebook at times, left his therapy worksheets in his truck, and once forgot his notebook at his father's house. (Tr. 791, 797, 803).

## Analysis

SSR 16-3p, applicable here, requires the ALJ to consider the entire record, and to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3p, 2016 WL 1119029 at *7. "Although it is appropriate for an ALJ to consider a claimant's

daily activities when evaluating their credibility, SSR 96-7p at *3, this must be done with care…a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).

Plaintiff's point is well-taken in that the ALJ misrepresented facts regarding plaintiff's activities of daily living. The ALJ misrepresented information regarding plaintiff's activities with his children, with taking care of his trailer, and with his father. The ALJ focused on how plaintiff at one point had custody of his three-year-old twins on weekends and later had them seven days a week during the day. (Tr. 43, 45, 52). These statements come from the years 2015 and 2016 before plaintiff's memory difficulties became more substantial. Additionally, the ALJ supported his decision by citing multiple times to plaintiff's ability to do chores around the camper, cook, shop, and more. (Tr. 43, 45, 54). However, plaintiff made meals only by microwave since he was forgetful, would lose track of time, and he would often forget items he needed while shopping. (Tr. 275-276, 280). The ALJ overstated what the record established plaintiff was able to do.

Additionally, the ALJ exaggerated plaintiff's involvement with his father stating, "Despite his memory complaints, he said he helped his father manage appointments." (Tr. 54). The ALJ also said plaintiff, "helped his father make it to his appointments," "helped his father to appointments," and "helped his father with appointments." (Tr. 43, 45). At the evidentiary hearing, however, plaintiff said, "I hang out with my dad a lot, go to the doctors with him and stuff." (Tr. 81). There

is a great difference between plaintiff having the ability to manage and remember his father's appointments for him as opposed to simply going along with his father to his appointments. Not only that, but the ALJ misstated this fact at least five times within his analysis of plaintiff's activities. (Tr. 43, 45, 54).

Due to the issues in this case revolving partly around plaintiff's memory difficulties, this misrepresentation of plaintiff's activities with his father can mislead the credibility analysis regarding plaintiff's memory abilities or lack thereof. Also, the misrepresentation of plaintiff's difficulty with receiving his medications, taking his medications, and the labeling of said difficulties as "noncompliance" is inaccurate. The ALJ failed to consider these facts with care.

The ALJ rigidly identified plaintiff's issues with medications as "…evidence of noncompliance." (Tr. 52). However, there are a variety of events that contributed to plaintiff's issues in receiving and taking his medications. Plaintiff reported issues with side effects consisting of drowsiness, dizziness, lack of focus, diarrhea, incontinence, and a rash on his chest. (Tr. 574, 660). Plaintiff also lost his insurance, needed his partner's help with remembering his medications, and he received pill boxes to help him take certain medications on time. (Tr. 550, 647, 759, 777). The ALJ must inquire as to why plaintiff was inconsistent with their treatment. *Murphy v, Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). The ALJ merely mentioned how plaintiff lost his insurance and failed to address reasons why plaintiff was noncompliant with medications. (Tr. 48).

The ALJ also ignored probative information that undermined his

conclusions.

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). The ALJ must consider all relevant evidence. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); 20 C.F.R. § 404.1545 (a)(1) and (3). Moreover, the ALJ must "engage sufficiently" with the medical evidence. *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016).

Of all twenty-one pages of the ALJ's decision, plaintiff's seven speech therapy appointments were merely mentioned in two small, quick paragraphs. (Tr. 52, 56). In said paragraphs, the ALJ filled space by discussing how plaintiff believed speech therapy was helping him rather than fully discussing the findings of the speech therapists themselves from all seven appointments. (Tr. 52). The ALJ ignored pertinent information by failing to mention the Ross Information Processing Assessment in which SLP Murphy concluded plaintiff's recent memory ranked in only the 50th percentile. (Tr. 826).

The ALJ incorrectly stated, "...significant memory complaints...were not supported by the longitudinal record..." and suggested there were many years of records noting normal memory, with no objective evidence supporting marked cognitive and memory deficits. (Tr. 54, 56). The ALJ ignored plaintiff's deteriorating memory since plaintiff may have had only sporadic issues with it

prior. However, the ALJ's job is not limited to the time only around when the evidentiary hearing took place. The ALJ must consider all evidence up to the date of the decision.

The ALJ ignored the commonsensical fact that medical conditions can worsen over time. Furthermore, it is apparent the ALJ made his decision through slightly skewed lenses. Plaintiff mentioned only other conditions in his disability application and not memory impairments specifically, thereby potentially tempting the ALJ to not consider all relevant evidence including but not limited to the many speech therapy appointments.

Between March 2016 and August 2017, PA Martin identified plaintiff's memory as impaired on numerous occasions. (Tr. 407, 548, 550, 553, 555, 558, 567). In November 2016, PA Bless identified plaintiff's short-term memory as "moderately impaired." (Tr. 746). Finally, between August and September 2017, SLP Jones consistently identified his memory as one of marked deficits. (Tr. 785, 791, 797, 803, 809, 815, 826). The submitted medical records date back to April 2014. Outside of the medical professionals' observations, plaintiff reported and complained of difficulties with memory on at least sixteen different occasions between April 2014 and September 2017. (Tr. 338, 375, 418, 480, 545, 546, 550, 553, 560, 561, 648, 663, 668, 672, 676, 751). Therefore, contrary to the ALJ's statements, significant memory issues were supported in the longitudinal record, with plaintiff's memory, although gradually, deteriorating over time.

Defendant's arguments are ill-founded in that they lacked any engaging

discussion of the gap in the ALJ's decision specifically regarding the 2017 speech therapy records. Defendant's brief simply discussed plaintiff's activities of daily living, the RFC analysis and the ALJ's alleged consideration of the longitudinal record, with the focus toward plaintiff having never amended his onset date of disability. Plaintiff's date-last-insured for DIB purposes does not affect this case as plaintiff also applied for SSI. Therefore, the ALJ must consider all relevant evidence, including all evidence leading up to the ALJ's decision. The ALJ did not sufficiently engage with or consider all relevant evidence.

Plaintiff's point about the credibility findings is meritorious for the same reason.

The ALJ's misrepresentation of facts and ignoring of pertinent medical evidence necessarily impacted his assessment of plaintiff's credibility. An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted. The Court must conclude that the ALJ failed to build the requisite logical bridge here.

This Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: February 18, 2020.**


**DONALD G. WILKERSON**
**UNITED STATES MAGISTRATE JUDGE**